BANK OF HAVELOCK v. WESTERN UNION TELEGRAPH CO.

(Circuit Court of Appeals, Eighth Circuit. November 16, 1905.)

No. 2,143.

1. TELEGRAPH COMPANIES—NEGLIGENCE—CARE TO ASCERTAIN IDENTITY AND AUTHORITY OF SENDERS OF MESSAGES—EXTENT AND LIMIT.

In the absence of notice of facts or circumstances which would awaken inquiry and arouse suspicion in the mind of a person of ordinary prudence and intelligence in a like situation regarding the authority to send it of the party who presents a message for transmission, the exercise by a telegraph company and its operators of reasonable care to receive and transmit genuine and authorized messages only does not require them to investigate or ascertain the identity, or authority to send it, of the person who tenders a message for transmission, whether that message is in writing, or is spoken directly to the operator, or is communicated to him by telephone.

But, when such facts or circumstances come to the notice of the company, or of its acting operator, the exercise of reasonable care to transmit genuine and authorized messages only requires the party who receives the notice either to investigate and ascertain the authority of the sender be-

fore transmitting the message, or to communicate the facts and circumstances and the inquiry or suspicion to the addressee at or before its delivery.

2. SAME—FALSE REPRESENTATION BY UNAUTHORIZED TELEGRAM—DAMAGES.

Action by mortgagees against a telegraph company for loss of their lien on cattle worth $3,500, caused by the receipt over the telephone, from one whose voice was not known to the operator and who had no authority to send it, and the transmission to the plaintiffs to whom it was addressed, of this telegram: "We will pay Barnes' draft for thirty-five hundred. Bank of Denison." *Held:*

(1) The telegram was not so indefinite that reliance and action might not lawfully be based upon it.

(2) The loss of the lien upon the cattle was not an unnatural or improbable effect of the delivery of the telegram, and the damages resulting from this loss were not too remote to warrant a recovery.

(3) A draft by Barnes was not essential to the maintenance of the plaintiff's action for the false representation embodied in the telegram and the resulting damage.

3. SAME—ACTION FOR DIMINUTION OF LIEN—SUFFICIENCY OF REMAINING SECURITY NO DEFENSE.

It is no defense to an action by mortgagees against a stranger for causing the loss of their lien upon some of the mortgaged property that it still covers an amount sufficient to secure the payment of the mortgage debt.

4. APPEAL—REVIEW—DIRECTED VERDICT ON SPECIFIC GROUNDS—WHEN PREJUDICIAL.

When a verdict is directed on specific, but untenable, grounds, it may not be affirmed on other grounds, unless it is clear beyond doubt that the new grounds could not have been obviated if they had been called to the attention of the defeated party at the time the verdict was rendered.

But, when the defeated party has introduced at the trial all the legal evidence he offered and has rested his case, he has thereby estopped himself from denying that he can do no more to overcome the objection that the evidence is insufficient to sustain a verdict in his favor; and if the bill of exceptions contains all the evidence, and it is clear beyond doubt that it would not sustain a verdict in his favor, an instruction by the court to return a verdict against him upon some other, but untenable, ground is error without prejudice, and no ground for reversal.

5. PLEADING—TRIAL OF ISSUES NOT RAISED BY PLEADINGS WAIVES THE PLEADINGS.

The trial of issues tendered by a pleading as though they had been properly made, in the absence of any plea, answer, or replication which raises them, estops the parties from subsequently denying that the issues were duly made, and from taking any advantage of the lack of the plea, answer, or replication.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Northern District of Iowa.

D. M. Kelleher (F. H. Helsell and Healy Bros., on the brief), for plaintiff in error.

H. D. Estabrook, Asa F. Call, and Rush Taggart (George H. Fearons, Craig L. Wright, and John F. Dillon, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and PHILIPS and CARLAND, District Judges.

SANBORN, Circuit Judge.    The plaintiffs constituted a copartnership under the title of the "Bank of Havelock," and they sued the

Western Union Telegraph Company, a corporation, for damages in the sum of $3,500, because it received by telephone from some one at Denison, in the state of Iowa, who had no right to send it, and delivered to the plaintiffs, this telegram:

"Dated Denison, Iowa, Feb. 28, 1902.

"To the Bank of Havelock:  We will pay Barnes' draft for thirty-five hundred.                                       Bank of Denison.

At the time this telegram was received the plaintiffs had a chattel mortgage on some cattle of the value of $3,500, which Barnes had bought, and they were induced by the telegram to lose their lien upon and to surrender the cattle to him.   On March 25, 1902, Barnes made a draft on the bank of Denison in favor of the plaintiffs for $3,500, but the drawee refused to pay it.   The Bank of Denison was a copartnership, composed of Leslie M. Shaw and Carl M. Kuehnle.   These partners, Charles E. Voss, the cashier, and A. B. Lorenson, were the only persons who had authority to send such a telegram, or to act for the bank in any way.   E. G. Lyman was the operator of the defendant at Denison, who received the telegram over the telephone and sent it to the plaintiffs.   He had been in his position from February 5, 1902. He did not know the voice of the person who gave him the telegram, but took it for granted that it was the voice of some one who had the right to send it.   He knew Voss, the cashier, and did not think that the voice was his.   He subsequently became acquainted with Barnes, but could not say that he recognized the voice as that of Barnes.   He did not know who gave him the message, because he did not recognize the voice which communicated it to him.   The foregoing facts were proved at the trial, and there was no evidence tending to prove any other facts which were material to the decision of the case before us.

At the close of the evidence counsel for the defendant made a motion, which the court granted, for an instruction to the jury to return a verdict for their client upon the specific grounds that plaintiffs had never taken or expended anything for any draft in reliance upon the telegram, that the telegram was so indefinite that they had no right to rely upon it, and that the plaintiffs had no right to recover for the surrender of the cattle, or for the loss of their lien upon them, because the telegram contained no agreement to indemnify them against any such loss, nor was the release of such security within the contemplation of the parties.   This ruling is assigned as error.   It is true that the plaintiffs never paid out or lost anything by taking or relying upon any draft of Barnes, and that they were not entitled to recover at the trial upon that ground.   But the Bank of Denison refused to pay the draft of Barnes on March 25, 1902, and it would not have paid it at any time after the telegram was delivered, if it had been presented. The telegram was not so indefinite or uncertain that reliance and action might not have been lawfully founded upon it.   It contained a direct promise to pay Barnes' draft for $3,500, and if it had been authorized by the Bank of Denison, and the plaintiffs had procured and paid value for a draft of Barnes for that amount, within a reasonable time after they received the telegram, they would have had a perfect cause of

action against the Bank of Denison for its amount. Coolidge v. Payson, 2 Wheat. 66, 4 L. Ed. 185; State National Bank v. Young (C. C.) 14 Fed. 889.

While the plaintiffs parted with no property in reliance upon the draft, they were induced by the telegram to surrender the cattle and to lose their lien by mortgage upon them, and they thereby lost $3,500 of their security for their claim against their debtor. Why were they not entitled to recover back this amount? Counsel for the telegraph company answer (1) because the plaintiffs surrendered the security of the cattle in reliance upon the promise of Barnes to make his draft on the Bank of Denison, and not in reliance upon the telegram; (2) because the failure of Barnes to make his draft was, and the telegram was not, the proximate cause of the loss; and (3) because the plaintiffs had ample security for their debt after the loss of their lien upon the cattle bought by Barnes, so that they never sustained any damage. The evidence, however, does not sustain these positions. It is that the plaintiffs refused to surrender the cattle or their lien upon them for the promise of Barnes to make his draft, or for the draft itself, and that they were induced to lose their lien by the telegram in evidence only. The failure of Barnes to make his draft was not the proximate or other cause of the loss of the plaintiffs, because the proof is that they would not have surrendered the cattle or their lien upon them upon the faith of it, and that the Bank of Denison would not have paid it in any event, so that its execution and presentation would have been nothing but one of those idle ceremonies which the law never requires. The proof is clear and convincing that the telegram was the proximate cause of the loss. Without it the plaintiffs would never have lost their lien upon the cattle without payment of their purchase price, and would never have suffered the damages they claim.

It is conceded that, if the telegram had been genuine, the plaintiffs could not have recovered of the Bank of Denison, unless they had purchased or discounted a draft of Barnes upon that bank for value. This, however, is because their cause of action against that bank would have arisen upon contract, if at all, and that contract would not have been made until the plaintiffs had accepted the offer tendered by the telegram, according to its terms. The action in hand, however, against the telegraph company, is not an action upon a contract, but is an action for a tort. The gravamen of this suit is false representation and resulting damage, and the acceptance of the apparent offer which the Bank of Denison never made neither conditioned nor limited it. The facts that the telegraph company, in violation of its duty of reasonable care, falsely represented to the plaintiffs that the Bank of Denison had promised to pay the draft of Barnes for $3,500, and that the plaintiffs, in reliance upon the truth of that representation, surrendered its lien upon cattle of the value of $3,500, constituted a perfect cause of action, and entitled the plaintiffs to a judgment. One who wrongfully deceives or misleads another, to whom he owes the duty of truthful statement, to his damage, is liable for the natural and probable consequences of his act. The natural and probable effect of the false telegram was the expenditure or the loss by the addressee of $3,500

upon the faith of it, and this loss by the surrender of the cattle, or of a lien upon them, was not so remote as to be either an unnatural or improbable effect of it. Marshall v. Buchanan, 35 Cal. 264, 95 Am. Dec. 95; Benton v. Pratt, 2 Wend. 385, 20 Am. Dec. 623; Rice v. Manley, 66 N. Y. 82, 23 Am. Rep. 30.

Nor can the defendant escape judgment for the loss inflicted because the plaintiffs have other security sufficient to satisfy their claim against the mortgagor. They had the right, as against the telegraph company, to all the security which they had obtained, and the depreciation or abstraction of any part of it by the latter was wrongful. It does not lie in the mouth of the telegraph company, after it has depreciated the security of the plaintiffs' $3,500, to say that it is not liable to make compensation for the loss because the plaintiffs have the power to inflict it upon the mortgagor. It is no answer to a suit by a mortgagee against a stranger for the removal of timber or houses or other valuable property from mortgaged lands, or for the conversion of mortgaged chattels, that the claim of the mortgagee is amply secured without the timber or houses taken or the chattels converted. And it is no defense to an action by a mortgagee for the loss of security caused by false representations that the plaintiff's claim is amply secured, notwithstanding the loss. A mortgagee is entitled to recover of a wrongdoer the value of the mortgaged property he has taken from the lien of the mortgage, although that lien still holds sufficient to secure the debt, and he is not required to inflict the loss upon the mortgagor. Shapard v. Hynes, 45 C. C. A. 271, 104 Fed. 449, 52 L. R. A. 675; Allen v. Butman, 138 Mass. 586, 587; Stevenson v. Lord (Colo. Sup.) 25 Pac. 313. The result is that the motion for a directed verdict should not have been granted for any of the reasons stated therein.

But counsel for the defendant insist that there was not sufficient evidence of the negligence of the defendant in the receipt of the telegram to sustain a verdict against it, and that the ruling of the court, if erroneous, was error without prejudice, and therefore no ground for reversal. The first paragraph of the argument of counsel for the plaintiffs is devoted to a discussion of the law and a citation of the authorities upon this question, but in their reply brief they insist that the sufficiency of the evidence of negligence is not open for consideration at this time (1) because that question was not presented by the motion or considered by the trial court, and (2) because after the defendant had answered the original petition, and had denied its material averments, the plaintiffs amended it by modifications of, and additions to, some of its allegations, and by adding to it a second count, wherein they set forth the same cause of action pleaded in the original petition in different and somewhat broader terms, and no answer to this amended petition was ever made. The presumption is that error produces prejudice, and it is only when it is clear beyond doubt that none resulted, or could have resulted, from an erroneous ruling that the judgment may be lawfully affirmed. Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; U. S. v. Gentry, 55 C. C. A. 658, 663, 119 Fed. 70, 75. Hence when a verdict is directed on limited, but untenable grounds, it may not stand on other grounds, unless it is clear beyond

doubt that the new grounds could not have been obviated if they had been called to the attention of the defeated party at the time the motion was made. Peck v. Heurich, 167 U. S. 624, 17 Sup. Ct. 927, 42 L. Ed. 302; Currier v. Dartmouth College, 117 Fed. 44, 47, 54 C. C. A. 430, 433. But where parties have produced all their evidence, and the court has received it, and they have rested their case at the trial, they have thereby admitted, and in that way estopped themselves from denying, that they can do no more to overcome the objection that the evidence is insufficient to sustain a verdict in their favor, because the question of the sufficiency of the evidence always arises in every case before its submission to a jury, and it is the province and duty of the court to determine it. Cole v. German Savings & Loan Soc., 59 C. C. A. 593, 602, 124 Fed. 113, 122, 63 L. R. A. 416; Brady v. Chicago & G. W. Ry. Co., 114 Fed. 100, 105, 52 C. C. A. 48, 52, 53, 57 L. R. A. 712; Railway Co. v. Belliwith, 83 Fed. 437, 441, 28 C. C. A. 358, 362; Commissioners v. Clark, 94 U. S. 278, 284, 24 L. Ed. 59; North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727, 733, 8 Sup. Ct. 266, 31 L. Ed. 287; Railway Company v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213. In W. B. Grimes Dry Goods Co. v. Malcolm, 164 U. S. 483, 491, 17 Sup. Ct. 158, 41 L. Ed. 524; Id., 7 C. C. A. 426, 427, 58 Fed. 670, 671, the trial court directed a juror to consent to a verdict because he had once agreed to it, although he protested that it was not his verdict before the court had received it. But the Supreme Court and this court held that the error was not prejudicial, and affirmed the judgment, because the record clearly showed that the evidence warranted a peremptory instruction and would not have sustained any other verdict, although that question had not been presented to the trial court by motion or suggestion, and it had submitted the case to the jury. When a defeated party has been permitted to present, and has introduced, all the legal evidence which he offered, has rested his case, and the court has instructed the jury to return a verdict against him upon a specified, but untenable, ground, its action is error without prejudice, and will not warrant a reversal of the judgment, where it is clear beyond doubt from a bill of exceptions, which contains all the evidence, that it would not sustain any other verdict. Smiley v. Barker, 28 C. C. A. 9, 13, 83 Fed. 684, 687; Moffat v. Smith, 41 C. C. A. 671, 101 Fed. 771; Baker v. Kaiser, 61 C. C. A. 303, 305, 126 Fed. 317, 319. A consideration of the sufficiency of the evidence, therefore, cannot be avoided, because this was not one of the reasons for the directed verdict specified in the motion.

Nor does the absence of an answer to the amended petition relieve us from this duty. The material averments of the original petition were denied in due time by a proper answer. The amended petition pleaded the same cause of action. The failure to answer it entitled the plaintiffs to judgment by default. They never applied for such a judgment. They never suggested the absence of an answer, or the admission of the averments of the amended petition by the defendant, until their counsel filed their reply brief in this court. They appeared in the court below, introduced evidence and tried this action as though the averments of the amended petition had been denied by a formal

answer, and it is now too late for them to insist upon its absence for the first time in this court. Their silence upon this subject induced the defendant and the court below to expend time and labor in the trial of issues which they tendered in their amended petition in the belief that these issues were raised by the pleadings and that it was their duty to try them, and they are now estopped from denying that these conclusions were correct. The trial of issues tendered by a pleading, in the absence of a plea, answer, or replication which raises them, as though they had been thus presented, estops the parties from subsequently denying that the issues were properly made, and from taking any advantage of the absence of such a plea, answer, or replication. Keator Lumber Co. v. Thompson, 144 U. S. 434, 437, 12 Sup. Ct. 669, 36 L. Ed. 495; North Chicago St. Ry. Co. v. Burnham, 42 C. C. A. 584, 586, 102 Fed. 669, 671; Schuster v. Carson, 28 Neb. 612, 615, 44 N. W. 734; Wright v. Waddell, 89 Iowa, 350, 364, 56 N. W. 650; Anderson v. Independent School District (C. C.) 78 Fed. 750, 751; Loomis v. Riley, 24 Ill. 307, 309; Clark v. City of Austin, 38 Minn. 487, 38 N. W. 615. The record in this case contains all the evidence at the trial, and the question therefore becomes instant and unavoidable whether or not it is clear beyond doubt that the evidence of the negligence of the telegraph company was insufficient to sustain a verdict against it.

The question is essentially one of law. The action is for damages caused by the false representation of the defendant, contained in the telegram, that the Bank of Denison sent it. There was no actual intent by the defendant to deceive the plaintiffs and the sole basis of the action is that the deceit and damage were caused by the breach of the duty of the defendant and of its operator, Lyman, to exercise reasonable care to ascertain whether or not the person who spoke the telegram to the operator over the telephone was authorized by the Bank of Denison to do so. The facts are undisputed. There were three persons, Kuehnle, Voss, and Lorenson, who had lawful authority to telephone the message to the operator in the name of the bank, or to empower others to do so. Lyman subsequently became acquainted with Barnes, and could not say that the dispatch was communicated by his voice. He knew Voss, and thought that the message was not spoken by his voice. It might have been lawfully communicated by the voice of Kuehnle or of Lorenson, or of some other person whom one of them or the cashier directed to do so. Lyman did not recognize the voice of the person who sent it, and did not know whose it was. But he took it for granted that it was the voice of some one who had the right to communicate it and to direct its transmission. This is all the testimony upon this subject, and it discloses nothing in the situation or transaction to warn the operator, or to arouse his suspicion, that the telegram was not spoken to him by one who had the legal authority to send it on behalf of the bank. It presents this question: Does the discharge of the duty which a telegraph company owes to the addressee of a message to exercise reasonable care to receive and transmit it correctly and speedily, so that it will represent the truth, require its operators to investigate and ascertain the identity or authority of those from whom they receive messages by telephone or otherwise?

Our attention has been challenged to sections 2161–2164 of the Code of Iowa of 1897. Section 2161 provides that, if the proprietor of a telegraph company refuses to transmit messages "with fidelity and without unreasonable delay," it shall no longer have the right of eminent domain, or be protected by the laws relating to corporations. Section 2162 requires every person employed in transmitting messages by telegraph to do so "with fidelity and without unreasonable delay," and imposes a penalty for failure to do so and for "willfully and wrongfully" taking or receiving any such message. Section 2163 provides that the proprietor of a telegraph line—

"Is liable for all mistakes in transmitting or receiving messages made by any person in his employment or for any unreasonable delay in their transmission or delivery and for all damages resulting from failure to perform the foregoing or any other duty required by law."

Section 2164 declares that in any action against any telegraph company for damages caused by erroneous transmission of a message, or by unreasonable delay in delivery of a message, negligence on the part of the telegraph company shall be presumed upon proof of erroneous transmission or delivery. These provisions of the statutes are significant, both in what they contain and what they omit, and they indicate the true boundaries of the duties of telegraph companies. They prescribe their duty to exercise reasonable care to receive, transmit, and deliver messages speedily and without mistakes, and they impose penalties for failures to do so. But they do not charge upon such companies the duty to ascertain the identity or authority of those who tender messages to send them, nor do they impose any liability or penalty for a failure to do so. They recognize the fact that the business, and hence the duty, of telegraph companies, is to speedily and correctly transmit the messages presented to them, not to investigate, ascertain, or guaranty their truth, or the identity or the authority of those who send them. The act or the alleged neglect of which the plaintiffs complain in this case is not one of those denounced in these statutes, and they have no farther relevancy in this action. The defendant's alleged neglect is not a failure to transmit speedily or correctly, or to receive without mistake, the message tendered to the operator at Denison. The testimony is clear and undisputed that he received and transmitted without mistake the message which was spoken to him over the telephone. Did he fail to discharge his duty because he did not ascertain the authority of the person who spoke it to send it in the name of the bank?

The great purpose of telegraphy is the quick transmission of messages from senders to addressees. In the conduct of this business all other considerations are subordinate. The telephone furnishes the most speedy and convenient means of communicating these messages from the senders to the offices of the telegraph companies, and from these offices to the addressees of the messages. For this reason its use for this purpose has become general throughout the land. The persons who operate the telephones are not generally the business men or officers of corporations in whom the authority to send the telegrams is vested in the first instance, but young men and women to

whom this authority is delegated by parol, frequently through several intermediaries. An inquiry and decision by telegraph operators of the identity and authority of those who speak the messages over the telephone are utterly incompatible with their rapid receipt and transmission, and a new duty to investigate and determine this authority before sending the messages, a duty which would be so deleterious to the prime object of the business of telegraphy, ought not to be imposed without great hesitation. It is true that the use of new inventions often creates new rights and imposes new duties. But the duty was never imposed upon telegraph companies before the use of telephones to ascertain the genuineness of the signatures to written messages, and the authority of those who presented them to direct their transmission, and no reason occurs to us why a duty of this nature should now be imposed upon them in receiving messages by telephone.

Moreover, the imposition of such a duty by the decision, which counsel for the plaintiffs seek, that the exercise of reasonable care in the receipt of messages by telephone requires inquiry and determination of the identity and authority of those who communicate them, would be violative of the basic principle of business and judicial action. Such a rule must be founded upon the erroneous presumption that men are generally deceitful and dishonest, and it would be destructive of itself. If the telegraph operator must presume that one, with whose voice he is not familiar, who speaks a message to him over the telephone or otherwise, is deceitfully impersonating another, or is without authority to send it, then by the same mark he must presume that the statements of those who identify the sender, or vouch for his authority, are also false and fraudulent, and his investigation would be both tedious and futile. The truth is that the great majority of private citizens and public officials alike are honest and truthful, and that the entire civic fabric rests upon the fundamental presumption that they are so. Business cannot be transacted, contracts cannot be made and enforced, the rights of citizens cannot be measured and protected by the courts upon any other presumption than that men and women are honest, truthful, and innocent of wrong until the contrary appears. The telegraph company and its employés may, like all others, safely rely upon this presumption in receiving messages either in writing or by parol. In the absence of notice of facts or circumstances which would suggest or arouse suspicion in the mind of a person of ordinary caution of false impersonation, or of want of authority, the exercise of reasonable care by a telegraph operator to receive messages from those only who have authority to send them does not require him to investigate the identity or authority of those who present them, whether the messages are in writing, or are spoken directly or over the telephone by unfamiliar voices. He may take it for granted that those who present them have the right to send them. Western Union Tel. Co. v. Meyer, 61 Ala. 158, 32 Am. Rep. 1. A care which would delay messages presented to the operator by a person, or by a voice unknown to him, until he could inquire and ascertain the identity and authority of the persons who present them, would not be ordinary, but extraordinary, care, for it would be a care

which persons of ordinary caution and intelligence do not exercise in similar situations. It would not be reasonable, but unreasonable, care, because it would prevent the speedy transmission of messages and thwart the main purpose of telegraphy.

But notice of facts and circumstances which would put a person of ordinary caution upon inquiry is notice of all the facts to which a reasonably diligent inquiry would lead. And, whenever facts or circumstances come to the notice of a telegraph company, or of its operators, which would arouse the suspicion of a person of ordinary prudence and intelligence in a like situation, and would suggest to his mind that the party who presents the message is not authorized to send it, the exercise of reasonable care requires them either to investigate and ascertain his authority before transmitting it, or to communicate the facts and circumstances and the suspicion to the addressee at or before the delivery of the message. Elwood v. Western Union Tel. Co., 45 N. Y. 549, 6 Am. Rep. 140; McCord v. Western Union Tel. Co., 39 Minn. 181, 39 N. W. 315, 1 L. R. A. 143, 12 Am. St. Rep. 636; Pacific Postal, etc., Co. v. Bank of Palo Alto, 109 Fed. 369, 48 C. C. A. 413, 54 L. R. A. 711; May v. Western Union Tel. Co., 112 Mass. 90; Bank of California v. Western Union Tel. Co., 52 Cal. 280.

Many authorities have been cited and considered in reaching these conclusions. Cases which involve mistakes in the transmission of messages, like Strause v. Western Union Tel. Co., 8 Biss. 104, Fed. Cas. No. 13,531, and Fererro v. Tel. Co., 9 App. D. C. 455, have little relevancy to the question here in hand, because the law is well settled that it is the duty of a telegraph company to exercise reasonable care to correctly communicate the messages it receives to those to whom they are addressed. Nor is the case of Western Union Tel. Co. v. Uvalde National Bank (Tex. Civ. App.) 72 S. W. 232, Id. 77 S. W. 603, 606, 65 L. R. A. 805, either material or persuasive. In that case a telegraph operator gave the call for a certain town to a member of his union, who tapped one of the company's wires and sent such forged messages to a bank that it cashed a worthless draft. The courts of Texas held that the company was negligent, either because the operator gave out the call or because the company had not used some unknown means that they did not specify to prevent scoundrels from tapping its wires. If no such means were shown by the record or were known to, or suggested by, the court, and there was no evidence that telegraph companies had ever used such means, how could it be a lack of ordinary care to fail to do so? The cases that are pertinent to the question before us have been cited above under the rules which they respectively illustrate. In Elwood v. Western Union Tel. Co., 45 N. Y. 549, 556, 6 Am. Rep. 140, the operator received and transmitted to a bank a message dated at another station, which held out the person who tendered the message as worthy of credit, and bore the forged signature of the cashier of another bank, who, the operator knew, was not the person who presented the message for transmission. In McCord v. Western Union Tel. Co., 39 Minn. 181, 39 N. W. 315, 1 L. R. A. 143, 12 Am. St. Rep. 636, and Pacific Postal,

etc., Co. v. Bank of Palo Alto, 109 Fed. 369, 48 C. C. A. 413, 54 L. R. A. 711, the operators themselves forged and transmitted telegrams which induced the payment of money to those who had no right to it. In Bank of California v. Western Union Tel. Co., 52 Cal. 280, the operator employed a subagent to send messages, and he forged and transmitted a message to a bank which induced it to pay $1,200 to himself; and in May v. Western Union Tel. Co., 112 Mass. 90, the company delivered a telegraphic order for 325 brass tubes a second time five days after its first delivery, and the addressees filled the order a second time in the belief that it was a second order. These are the strongest cases in support of the contention of counsel for the plaintiffs, and they fall far short of sustaining their position. In three of them the acting operators themselves made the deceitful messages and perpetrated the fraud, and in each of the others the employés of the telegraph company were aware of facts and circumstances which would have led a person of ordinary caution to an inquiry which would have prevented the injury.

On the other hand, in Western Union Tel. Co. v. Meyer, 61 Ala. 158, 32 Am. Rep. 1, one Max Reis was the nephew of the plaintiff, Meyer, who resided in Selma, Ala. A person unknown to the telegraph operator at Cincinnati, and who was not Max Reis, presented to him for transmission a message to Meyer, signed "Max Reis," wherein Meyer was requested to send him money by telegraph immediately. Meyer complied with the request, and the telegraph company paid the money to the person who presented the message. Meyer brought an action against the company for the money he had lost, and the Supreme Court of Alabama denied a recovery upon the ground that the defendant had been guilty of no breach of duty. No decision of any court has been cited or discovered which is inconsistent with the rule that in the absence of notice of facts or circumstances which would awaken inquiry and arouse suspicion in the mind of a person of ordinary prudence and intelligence in a like situation, regarding the authority of the party who presents a message for transmission to send it, the exercise by a telegraph company and its operators of reasonable care to receive and transmit genuine and authorized messages only does not require them to investigate or ascertain the identity or authority to send it of the person who tenders a message for transmission, whether it is in writing or is spoken directly to the operator, or is communicated to him by telephone; and the conclusion is that this is the law which ought to govern, and which does govern, this subject.

Tried by this rule there is no evidence in this case of any negligence of the defendant or of its operator, Lyman. There were three persons who had original authority to send the message, and they had power to direct others to do so. It came to the operator in a voice which he did not recognize, and that he thought was not the voice of the cashier, and that he could not say was the voice of Barnes. There is no evidence that he could have recognized the voices of Kuehnle or Lorenson or of others to whom they might have delegated the power to send the message, and the natural and legal

presumption was that it was spoken by some of those who had authority to send it. The operator relied upon that presumption, as he had a right to do, in the absence of suspicious facts or circumstances, and neither he nor the company was guilty of any negligence or breach of duty to the plaintiffs.

The result is that it is clear beyond doubt that no verdict or judgment in favor of the plaintiffs could have been sustained in this case, and as the erroneous ruling of the court below did not prejudice, and could not have prejudiced, the plaintiffs, the judgment must be affirmed. It is so ordered.